**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**JEFFREY WAYNE YOUNG,**

       **Plaintiff,**

**v.**                                   **Case No.: 2:15-cv-06972**

**CAROLYN W. COLVIN,**
**Acting Commissioner of the**
**Social Security Administration,**

       **Defendant.**

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's application for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross motions for judgment on the pleadings as articulated in their briefs. (ECF Nos. 7, 8).

The undersigned has thoroughly considered the evidence and the applicable law. For the following reasons, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **REVERSED;** this matter be **REMANDED** for

1

further proceedings pursuant to sentence four of 42 U.S.C. § 405(g); and this action be **DISMISSED, with prejudice,** and removed from the docket of the Court.

## I.   Procedural History

On November 18, 2011, Plaintiff, Jeffrey Wayne Young ("Claimant"), completed an application for DIB, alleging a disability onset date of October 12, 2011, due to "right ear damage; rheumatoid arthritis; degenerative disc disease; chronic back pain; bulging disks in neck; numbness in head and neck; numbness in tailbone; numbness in left thigh; burning in right knee; burning in feet and hands; low hormone levels; high blood pressure; nerve pain in right hand; fibromyalgia; enlarged thyroid; high cholesterol; Vitamin D deficiency; acid reflux; diverticulitis; [and] learning disability." (Tr. at 136, 151). The Social Security Administration ("SSA") denied Claimant's application initially and upon reconsideration. (Tr. at 74, 87). Claimant filed a request for an administrative hearing, which was held on September 25, 2013, before the Honorable Sabrina M. Tilley, Administrative Law Judge ("ALJ"). (Tr. at 31-69). By written decision dated December 19, 2013, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 11-25). The ALJ's decision became the final decision of the Commissioner on April 23, 2015, when the Appeals Council denied Claimant's request for review. (Tr. 1-3).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 1). The Commissioner filed an Answer and a Transcript of the Administrative Proceedings. (ECF Nos. 5, 6). Both parties filed memoranda in support of judgment on the pleadings, (ECF Nos. 7, 8), and Claimant filed a reply memorandum in opposition to the Commissioner's brief. (ECF No. 9). Consequently, the issues are fully briefed and ready for resolution.

## II.    Claimant's Background

Claimant was 49 years old at the time he filed the instant application for benefits, and 51 years old on the date of the ALJ's decision. (Tr. at 11). He has a high school education and communicates in English. (Tr. at 36, 150, 152). Claimant's past relevant work includes jobs as a well tender, rig operator, laborer, and welder helper. (Tr. at 164).

## III.    Summary of ALJ's Decision

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. § 404.1520. The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* § 404.1520(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* § 404.1520(c). If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* § 404.1520(d). If the impairment does, then the claimant is found disabled and awarded benefits.

3

However, if the impairment does not meet or equal a listed impairment, the adjudicator must determine the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* § 404.1520(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* § 404.1520(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, as the fifth and final step in the process, that the claimant is able to perform other forms of substantial gainful activity when considering the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. § 404.1520(g); *see also McLain v. Schweiker,* 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d. 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at every level in the administrative review," including the review performed by the ALJ. 20 C.F.R. § 404.1520a. First, the ALJ evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* § 404.1520a(b). If such impairment exists, the ALJ documents his findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria

specified in 20 C.F.R. § 404.1520a(c). Third, after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* § 404.1520a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* § 404.1520a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual function. *Id.* § 404.1520a(d)(3).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2016. (Tr. at 13, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since October 12, 2011, the alleged onset of disability. (*Id.,* Finding No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "chronic cervicalgia, thoracic and lumbar strain, thoracolumbar spondylosis, hypothyroidism, hypotestosteronism, fibromyalgia, vertigo, borderline intellectual functioning, pain disorder, major depressive disorder and anxiety disorder." (*Id.*, Finding No. 3). The ALJ also considered Claimant's other impairments of high blood pressure, acid reflux,

and diverticulitis, but found them to be non-severe. (*Id.*).

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 14-16 Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except the claimant could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch and crawl. He has unlimited manipulation, visual and communication abilities. He could have occasional exposure to extreme cold, vibrations and hazards. He can understand, remember and carry out simple tasks with occasional interaction with coworkers and supervisors, but no interaction with the general public. He can make simple work-related decisions and can adapt to simple changes in a work routine. He should not engage in work involving fast-paced production requirements.

 (Tr. at 16-23, Finding No. 5). At the fourth step, the ALJ found that Claimant was unable to perform any past relevant work. (Tr. at 23, Finding No. 6). Under the fifth and final inquiry, the ALJ reviewed Claimant's past work experience, age, and education in combination with his RFC to determine his ability to engage in substantial gainful activity. (Tr. at 23-25, Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1962, which placed him in the age category of younger individual age 18-49 on the alleged disability onset date; however, Claimant subsequently changed age category to individual closely approaching advanced age; (2) he had at least a high school education and could communicate in English; and (3) transferability of job skills was not material to the disability determination. (Tr. at 23-24, Finding Nos. 7-9). Taking these factors and Claimant's RFC into account, and with the assistance of a vocational expert, the ALJ concluded that Claimant could perform jobs that exist in significant numbers in the national economy. (Tr. at 24-25, Finding No. 10). At the

light exertional level, Claimant could work as a laundry folder; garment bagger, or electrode cleaner, and at the sedentary level, he could work as a carting machine operator; a polisher; or a cleaner. (Tr. at 24-25). Accordingly, the ALJ found that Claimant was not disabled as defined in the Social Security Act, and was not entitled to benefits. (Tr. at 25, Finding No. 11).

## IV. **Claimant's Challenge to the Commissioner's Decision**

Claimant asserts two challenges to the Commissioner's decision. First, he argues that the ALJ erred by finding him capable of performing a limited range of light work. (ECF No. 7 at 11-15). According to Claimant, both his treating physician, Dr. Donald Moore, and an agency consultant, Dr. Subhash Gajendragadkar, opined that Claimant would require the option of alternating between sitting and standing throughout the work day. The vocational expert testified that adding a sit/stand option to Claimant's RFC finding would reduce his exertional level from light to sedentary. Claimant contends that, in view of his age at the time of the administrative hearing, this reduction in exertional level would direct in a finding of disability. However, Claimant alleges that the ALJ improperly rejected Dr. Moore's opinions, thus failing to incorporate his recommendation for a sit/stand option into the RFC finding. Likewise, although the ALJ explicitly gave "significant weight" to Dr. Gajendragadkar's opinions, she implicitly gave no weight to his conclusion that Claimant required a sit/stand option. Claimant also complains that the ALJ never provided any reason for declining to accept Dr. Gajendragadkar's recommendation for a sit/stand option, leaving a key conflict in the evidence unresolved. (*Id.* at 15).

Second, Claimant asserts that the ALJ failed to pose hypothetical questions to the vocational expert that adequately conveyed the severity of Claimant's limitations

in persistence and pace and in education. Claimant indicates that the ALJ told the vocational expert that Claimant had a high school education, but did not explain that Claimant had significantly substandard scores when tested in reading and spelling. Furthermore, Claimant argues that the ALJ did not sufficiently account for Claimant's moderate deficits in persistence and pace. As a result, the vocational expert's testimony regarding suitable jobs available to Claimant was unreliable. Claimant maintains that in the absence of valid testimony establishing the specific jobs that Claimant is capable of performing, the Commissioner has failed to meet her burden at step five of the disability process. (*Id.* at 16).

In response, the Commissioner asserts that substantial evidence supports the conclusion that Claimant can perform work at the light exertional level. (ECF No. 8 at 13). The Commissioner points to Dr. Moore's treatment records, which show that Claimant has normal ambulation, motor strength, muscle tone, gait, and station. In addition, the records show no evidence of bony abnormality or tenderness in the joints, bones, or muscles, and no range of motion limitations. The Commissioner argues that although Dr. Moore diagnosed Claimant with chronic neck and back pain, he also found Claimant to be "dramatic" when making complaints and to require substantial reassurance. (*Id.* at 14). According to the Commissioner, Claimant's objective medical findings, treatment records, and daily activities contradict the extreme limitations contained in Dr. Moore's medical source statement.

With respect to Claimant's deficits in education, persistence and pace, the Commissioner argues that the ALJ accounted for them in the RFC finding by restricting Claimant to simple tasks, work-related decisions, and changes in work routine; only occasional contact with co-workers and supervisors; no contact with the general public;

8

and no fast-paced production requirements. (*Id.* at 17). The Commissioner argues that Claimant has not produced any medical evidence to support the contention that he has mental limitations that were not addressed by the ALJ in the RFC finding.

## V.     Relevant Medical History

While the undersigned has reviewed all evidence of record, only the medical information most relevant to the disputed issues is summarized below:

### A.  Treatment Records

On July 29, 2011, Claimant completed a patient information form provided by the Ashton Medical Clinic in order to establish primary care. (Tr. at 650-53). Claimant's past surgical/hospitalization history included one procedure in 1995 related to testicular torsion. Claimant identified his current medical problems as pain in the back from the neck to the tailbone, numbness of his head and hands, vertigo, low testosterone levels, and an enlarged thyroid. He indicated that his low testosterone and enlarged thyroid were being treated by Dr. Sankari. Claimant's medication regimen included Lovaza, Vitamin D, Androyel pump, Synthroid, and Pantoprazole. Claimant had no allergies and no recent immunizations. Claimant recorded that he did not exercise, had a high school education, was currently employed as a well tender, and had previously worked as a rig hand and rig operator. Claimant had suffered a work place injury in the 1980's, but did not believe his current job was a risk to his health. (Tr. at 651). Under the section entitled "review of systems," Claimant checked as positive: lack of exercise; weight loss or gain; sleeping difficulties; eyesight worsening and requiring correction; buzzing/ringing in the ears; motion sickness; painful feet; swollen joints; aching muscles and joints; chronic joint instability; recurrent back pain; neck pain; arthritis; trembling; numbness in hands and feet; leg, arm or hand

weakness; and thyroid problems. (Tr. at 652-53). Claimant did not note any positives in the mental health section of the form. (Tr. at 653).

On August 10, 2011, Claimant had his initial appointment at Ashton Medical Clinic with Dr. Donald Moore. (Tr. at 649). Claimant's blood pressure measured at 128/80, and he weighed two hundred thirty one pounds. Claimant's chief concern was back pain that had increased in the past one to two years. Claimant reported that he had now developed neck pain, as well. He worried that if the pain continued, he would lose his job. Claimant complained that he could not get any physician to listen to him and could not get a "straight answer." (*Id.*) He reported that a prior MRI showed two bulging disks. Claimant told Dr. Moore that he had sharp pain with tingling and numbness that increased with movement, and his symptoms began after he hit his head. The pain increased when he was working. He also had low back pain that radiated down both legs, although a recent MRI of his low back was negative. Claimant stated that he had seen a chiropractor, but added that no physician would prescribe pain medication for him.

Upon examination, Claimant was oriented in all spheres. All systems were noted to be normal, with the exception of neurologic, rectal, genitourinary, and skin. (Tr. at 649). Dr. Moore apparently deferred examination of the rectal, genitourinary, and skin; accordingly, those systems were not documented to be normal or abnormal. The neurologic system was designated as abnormal, with written findings of a hyper-reflexive upper extremity and +2/4 lower extremity. Dr. Moore diagnosed Claimant with "chronic diffuse neck, thoracic & lumbar spine" and hyperlipidemia. He ordered an x-ray of the entire spine, including the neck, and an MRI of the lumbar and thoracic spine, and he prescribed Elavil and Celebrex. He instructed Claimant to return in three

months. (*Id.*).  Claimant completed the x-rays on the same day. (Tr. at 659). Thomas Zekan, M.D., interpreted the films to show no abnormality in the cervical spine, arthritic changes in the thoracic spine with preserved vertebral body heights and disc spaces, and arthritic changes in the lumbar spine. Claimant's lumbosacral spine also had vertebral body heights and disc spaces that were preserved, but there was osteophyte formation seen throughout. However, there was no evidence of spondylolisthesis or spondylosis, and the sacroiliac joints were unremarkable. (*Id.*)

On August 16, 2011, Claimant underwent an MRI of the thoracic spine at Thomas Memorial Hospital. (Tr. at 370-71). David Abramowitz, M.D., reviewed the MRI and identified a small disk protrusion slightly to the left of midline at T8-9 and mild broad-based central disk bulges at T6-7 and T7-8. No other significant findings were noted.

Nine days later, on August 25, 2011, Claimant returned to Thomas Memorial Hospital for an MRI of the lumbar spine. (Tr. at 368-69). Robert Smith, M.D., interpreted this imaging and found a mild diffuse noncompressive posterior disk bulge at the L3-4 level. He also saw an asymmetric left paracentral disk bulge resulting in bilateral foraminal stenosis with more severe involvement of the left neural foramina at the L4-5 level. However, the remaining disk spaces appeared intact without evidence of degenerative disk disease. (Tr. at 368).

Claimant returned to Dr. Moore's office on August 31, 2011 to discuss the results of his MRI images. (Tr. at 648). Claimant reported that Celebrex and Elavil did not alleviate his pain, so he had been trying to refrain from doing any heavy work. He complained of occasional shooting pain in his arms and lower back when lifting his hands. He also felt pressure and numbness when turning his head up and to the right,

with tingling in his cheeks. He rated his pain at rest as 7 on a 10-point pain scale, but it increased to 10 at times, and the pain was constant. On physical examination, Claimant's neck, musculoskeletal, and neurologic systems were all abnormal. The findings included back and neck pain, and pain and numbness in both legs. Dr. Moore diagnosed Claimant with chronic global back pain, hypertension, and hyperlipidemia. (*Id.*) He referred Claimant to Dr. Kim for pain management, and to Dr. Schmidt for a surgical consultation. As Claimant was not receiving relief from the prescribed medication, Dr. Moore discontinued Celebrex and Elavil.

Dr. Moore saw Claimant on November 9, 2011 for his three-month follow-up. (Tr. at 647). Claimant advised that he had not seen Dr. Crow (for a surgical consultation). Claimant complained of back, neck, and bilateral knee pain, vertigo, and sleep issues. He reported that he lost his job on October 12, 2011 and had been unemployed since then. Claimant was observed to be "tearful and crying." Dr. Moore diagnosed Claimant with chronic low back pain, hypertension, and hypogonadism. Claimant was advised to continue his medication regimen, avoid salt, and lose weight.

Claimant returned to Dr. Moore's office on January 5, 2012, with a request that Dr. Moore complete Social Security disability paperwork. (Tr. at 646). Claimant reported that his back pain remained unchanged; however, the numbness in his left leg had gotten worse. He also had increased sensitivity and numbness in the right index finger. On examination, Dr. Moore documented that Claimant had back pain with bending, decreased upper extremity deep tendon reflexes, and absent deep tendon reflexes in the right lower extremity.

On February 6, 2012, Claimant presented to Dr. Moore's office with complaints of chronic low back pain, a burning sensation in the left foot, numbness in the right

second digit, sleep disorder, and hypothyroidism. (Tr. at 645). Dr. Moore performed an examination, which revealed a facial lesion. He diagnosed Claimant with hypogonadism, hypertension, chronic back pain, and left facial lesion. Claimant's Synthroid dosage was increased; he was encouraged to walk; and he was told to get laboratory studies performed.

Claimant returned to Ashton Medical Clinic on March 23, 2012 for complaints of cough and congestion. (Tr. at 640-42). He was examined by Gregory McCartney, Physician's Assistant ("PA"). The examination revealed that Claimant was obese, in no acute distress, and ambulating normally. His neck was supple with no cervical lymphadenopathy. (Tr. at 641). That same day, Dr. Moore completed a medical examination report, evaluating Claimant's fitness for a commercial driver license. (Tr. at 661-63). Dr. Moore documented that Claimant had vertigo, high blood pressure, digestive problems, sleep disorders, degenerative disc disease, chronic low back pain, and rheumatoid arthritis. Dr. Moore noted that Claimant had suffered from persistent vertigo since 2009, which was exacerbated when he turned his head, also giving Claimant the sensation that the room was spinning. (Tr. at 663). Dr. Moore added that Claimant was overweight and had spine or other musculoskeletal issues. He opined that Claimant did not meet the standards for a commercial driver's license due to vertigo.

Claimant was examined by Dr. Moore on June 1, 2012 for complaints of a sharp pain in the head which had occurred intermittently for one month. (Tr. at 636-39). Claimant's medication regimen at that time included Vitamin D2, Ziac, Lovaza, Levothroid, Pantoprazole, Androgel, Celebrex, and Amitriptyline. (Tr. at 636). Claimant appeared in no acute distress and was ambulating normally. (Tr. at 638).

Claimant's insight and judgment were good; however, he had numerous somatic complaints. Claimant's neck was supple with a full range of motion and no enlargement of the thyroid. Claimant exhibited normal motor strength and tone and had no bony abnormalities. His extremities were not edematous. Claimant had a normal gait and station, and his thoracolumbar spine had normal curvature. Claimant was assessed with hyperlipidemia, reflux esophagitis, lumbago, skin sensation disturbance, testicular hypofunction, and unspecified hypothyroidism. He was advised to continue taking his medications and was encouraged to take walks in the evening for exercise.

Claimant returned to Dr. Moore one month later, on July 12, 2012, with complaints of diverticulitis and back and leg pain due to arthritis. (Tr. at 631-35). Claimant also reported thigh pain, stating that his left thigh felt numb on the lateral surface in addition to feeling cold and highly sensitive. Claimant also described the pain as a stinging and burning sensation. However, Claimant's gait and station were normal, and his cranial nerves were grossly intact. (Tr. at 633). Claimant admitted that he still had not started an exercise regimen. Due to his stomach complaints, an abdominal x-ray was performed that day. Dr. Thomas Zekan interpreted the film as showing no evidence of active disease. (Tr. at 657).

On August 31, 2012, Claimant complained to Dr. Moore of left shoulder pain with a decreased range of motion. (Tr. at 627-30). Claimant also told Dr. Moore that he no longer wished to treat with Dr. Sankari and wanted Dr. Moore to manage his prescriptions. (Tr. at 628). At this visit, Claimant weighed two hundred forty one pounds and was 5 foot, 8 inches tall. A physical examination was not performed. Claimant was given a Depo-medrol injection for shoulder pain and advised to return in one month. Claimant also underwent a left shoulder x-ray that day, which was

interpreted as showing no fractures or dislocation, but some narrowing and osteophyte formation in the acromioclavicular joint consistent with degenerative change. (Tr. at 656).

Claimant returned to Dr. Moore on December 14, 2012 with complaints of bilateral soreness in the hips, left thigh numbness, and urinary hesitancy. (Tr. at 669-73). Claimant reported joint pain all over and symptoms of gastroesophageal reflux disease ("GERD"). He stated that he had not heard from Social Security about his disability application and was feeling overwhelmed and depressed. (Tr. at 672). Dr. Moore performed a physical examination of Claimant. He noted that Claimant was "healthy-appearing," in no acute distress, and ambulating normally. Psychiatrically, Claimant was oriented to time, place and person with normal remote and recent memory and normal mood and affect. His insight was determined to be good. Claimant's eyes, ears, nose, mouth, throat, lungs, heart, abdomen, genitourinary, and skin examinations were all unremarkable. The musculoskeletal system showed normal motor strength and tone, with no tenderness or bony abnormalities. The extremities were without edema or varicosities and had normal range of motion. Claimant did not complain of pain or tenderness of the cervical spine on palpation, and he had a normal active range of motion of both the cervical and thoracolumbar spine. Claimant's gait and station were likewise normal. Claimant's diagnoses remained essentially the same, and he was told to return for follow-up in three months. (Tr. at 673).

Claimant returned two months early, on January 12, 2013, to discuss with Dr. Moore possible depression, problems with concentration, and left thigh numbness. (Tr. at 667-69). At this time, Claimant's medication regimen included Arimidex, Amitriptyline, Celebrex, Levothroid, Pantoprazole, Androgel, Lovaza, Vitamin D2 and

15

Ziac. (Tr. at 667-68). No record of a physical examination was prepared at this visit. Dr. Moore noted that Claimant was eager to get better and wished to continue Arimidex to see if his symptomology would improve. (Tr. at 669).

On January 25, 2013, Claimant returned to Dr. Moore's office with the chief complaint of back and leg pains. (Tr. at 687) Claimant reported to Dr. Moore that he had a disability hearing coming up, and this was causing stress and panic. (Tr. at 688). Claimant also apparently had jury duty and felt that his back and leg pain prevented him from sitting long periods of time. (Tr. at 687-88). On physical examination, Claimant appeared healthy, in no acute distress, and presented with normal ambulation. (Tr. at 689). His judgment was good, but his insight was documented as poor. Claimant's mood was described as normal, and his affect was active and alert. He was oriented in all three spheres and displayed normal remote and recent memory. Dr. Moore agreed to write Claimant a letter to get him removed from jury duty and told him to follow-up as directed. (*Id.*).

Claimant returned to Dr. Moore's office on March 18, 2013 with complaints of low back pain, right hip pain, left abdominal soreness, and hot flashes, which he attributed to the Arimidex. (Tr. at 691-94). Claimant told Dr. Moore he was having some back pain; his appetite had increased; he was sedentary; and he was gaining weight. (Tr. at 693). He further reported that standing increased his back pain, in addition to causing soreness in his hip. Claimant's psychiatric examination was unchanged from the last visit. He appeared in no acute distress and ambulated in a normal fashion. His gait and station were normal, as was his musculoskeletal examination. Claimant's deep tendon reflexes were +2 in the knees and ankles, and his muscle tone and strength were normal for his age. Claimant's cervical spine was

16

normal, but his thoracolumbar examination revealed lumbar/lumbosacral paraspinal tenderness, with a limited active range of motion. Dr. Moore noted Claimant continued to have chronic low back pain so he prescribed Zanaflex in addition to Claimant's current medication regimen. (Tr. at 694). Dr. Moore also opined that the Claimant looked well, but he seemed depressed with no solution for his chronic pain. Dr. Moore documented that he spent considerable time discussing management of chronic pain; however, Claimant declined a pain management referral. (*Id.*).

Claimant returned to Dr. Moore three additional times in 2013. (Tr. at 697-704, 713-17). On June 14, 2013, Claimant complained of lower abdominal pain with nausea. (Tr. at 697). Claimant appeared healthy and well developed, in no acute distress and exhibiting normal ambulation. (Tr. at 698). Claimant was diagnosed with right and left lower quadrant abdominal pain and diverticulitis of the colon. (Tr. at 699).

Claimant returned on June 17, reporting that his abdominal symptoms had improved. (Tr. at 702). Claimant appeared well and demonstrated normal ambulation. His mood and affect were normal, and he was active and alert; however, he appeared very somatic. Hs physical examination, including that of his musculoskeletal system was unremarkable, with normal range of motion, normal muscle tone and strength, and no pain on palpation. (Tr. at 702-03). Dr. Moore commented that Claimant appeared very "dramatic with his worries and complaints and takes a lot of reassurance." (Tr. at 703).

On September 18, 2013, Claimant returned with complaints of more intense back pain. He described his whole back being sore, with a feeling of a "catch" in the low back, left thigh pain, the sensation of bugs crawling on his leg, left shoulder pain, bilateral knee pain, and pain and stiffness in his neck. (Tr. at 713-17). Claimant was

noted to be healthy-appearing, although obese, weighing at 233.4 pounds at 5 feet, 9 inches in height. (Tr. at 715). He appeared in mild distress, but was ambulating normally; was active and alert; demonstrated good judgment; normal mood and affect; full orientation to time, place and person; and normal remote and recent memory. (Tr. at 715). Upon examination, Claimant's neck was supple with a mild decreased range of motion. His musculoskeletal examination was normal, as were gait and station. Claimant's deep tendon reflexes, muscle tone, and strength were normal. Dr. Moore commented that Claimant continued to have chronic pain and had some dizziness. Claimant was assessed with unspecified acquired hypothyroidism, unspecified Vitamin D deficiency, unspecified hyperlipidemia, lumbago, chronic pain syndrome, dizziness, and giddiness. (Tr. at 716). Claimant was prescribed Antivert for dizziness. In addition, Claimant's medication regimen included Amitriptyline, Anastrozole, Androgel, Celebrex, Levothroid, Lortab, Lovaza, Mobic, Pantoprazole, Vitamin D2, Zanaflex, and Ziac. (Tr. at 713-14). He was told to return for follow-up in 3 months. (Tr. at 716).

### B. Evaluations and Opinions

Dr. Donald Moore completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) on January 5, 2012. (Tr. at 554-57). Dr. Moore indicated that Claimant could occasionally lift and/or carry ten pounds and frequently lift and/or carry less than ten pounds. Claimant could stand and/or walk less than two hours total with normal breaks. (Tr. at 554). Although the form required an explanation for the precise limitation opined, Dr. Moore did not provide one. Dr. Moore also stated that Claimant could sit for less than six hours in an eight-hour work day and had to periodically alternate between sitting and standing to relieve pain and discomfort. He felt that Claimant was limited in his ability to push and pull with his upper and lower

18

extremities. With respect to medical/clinical findings supporting these exertional opinions, Dr. Moore listed "decreased ROM [range of motion] and pain [with range of motion]." (Tr. at 555). As to postural limitations, Dr. Moore believed Claimant could frequently kneel, crouch, crawl or stoop. He could occasionally balance, but could never climb ramps, stairs, ladders, ropes or scaffolds. Dr. Moore supported these findings by stating that Claimant had pain with range of motion in his legs and was unstable when crouching. Dr. Moore found Claimant to be capable of only occasional reaching and handling, but he had no limitations in fingering and feeling. He supported these opinions by stating that Claimant had decreased range of motion in the upper extremities, as well as increased pain. (Tr. at 556). Claimant had no visual or communicative limitations. As for environmental limitations, Claimant was unlimited in exposure to noise, dust, humidity, wetness, fumes, odors, chemicals, and gases. However, he was limited in his exposure to temperature extremes, vibration, and hazards, such as machinery and heights. (Tr. at 557). Dr. Moore explained that Claimant had numbness and tingling in the upper extremities, impaired heel to toe ambulation, and poor heel to toe walking.

On January 17, 2012, agency consultant, Kip Beard, M.D., performed an Internal Medicine Examination. (Tr. at 560-65). Dr. Beard documented Claimant's chief complaints as "chronic joint and spinal pain, low hormone levels, and right ear damage." (Tr. at 560). With regard to the ear damage, Claimant stated that he began to have vertigo and imbalance in 2009, and the feeling of being "off-balance" affected his vision; particularly, when he turned his head to the right. (Tr. at 560). He was evaluated by an otolaryngologist, who told Claimant that he probably had right ear damage contributing to the problems. He was placed on medication and underwent

therapy. Nonetheless, Claimant reported that he continued to feel off-balance. In addition, when he turned his head to the right, things appeared to be moving in slow motion. His symptoms required him to be restricted from driving for a while, and he eventually lost his job. Claimant denied any other evaluation or treatment for his vertigo and imbalance, and denied any ear surgery.

Regarding his low hormone level, Claimant indicated that he had both hypothyroidism and hypotestosteronism. (Tr. at 561). He received medications for both conditions, but still felt fatigued all the time. Although he noticed some improvement when taking the medications, he continued to experience decreased stamina.

As far as his chronic pain, Claimant reported trouble with his neck, and middle and lower back pain, which began after an injury in 1985 and worsened in the last two years. He had been told that he had arthritis and was referred to Dr. Crow, a neurosurgeon, but after he lost his job, he could not afford to keep the appointment. Claimant had received medication, chiropractic care, and physical therapy. He described the pain as ever-present, starting at the neck and extending down to the tail bone. At times, the pain was 10 on a 10-point pain scale and prevented him from getting up.  Claimant also complained of burning, stinging between the shoulder blades, in his left lateral thigh, and in his hands intermittently. He had never had an EMG or nerve conduction study. He stated that his back and neck symptoms worsened with prolonged standing, bending, and lifting, and his hand symptoms worsened with overhead work. His medications did not fully control his symptoms. (Tr. at 561). Claimant reported having some chronic joint pain in his right hand, left shoulder, hips, right knee, and feet, and thought that he possibly may have been diagnosed with

rheumatoid arthritis by Dr. Moore during the prior summer. Claimant told Dr. Beard that he had trouble with prolonged sitting, standing, bending and lifting. However, he denied receiving any aspirations or injections for his symptoms.

Dr. Beard reviewed some of Claimant's medical records, including x-ray reports of the cervical, thoracic, and lumbosacral spine. (Tr. at 562). He noted arthritic changes in Claimant's thoracic and lumbosacral spine x-ray reports, and normal findings in the cervical spine x-ray report. Dr. Beard also reviewed some progress notes from Dr. Moore, but the dates of the notes were not listed in Dr. Beard's report.

Dr. Beard performed a physical examination of Claimant. (Tr. at 563-64). In general, Claimant was overweight, ambulating with a normal-appearing gait and no assistive devices. (Tr. at 563). He was able to get off and on the table without difficulty and could stand unassisted. He seemed comfortable while seated, but mildly uncomfortable when in the supine position. Dr. Beard observed that Claimant was a bit depressed, commenting that he became frustrated and tearful when discussing his termination from employment, which he reported occurred just two days before his daughter's wedding. (*Id.*). Claimant measured 5 feet, 8 inches tall and weighed 236 pounds. His head, ears, nose, throat, neck, chest, cardiovascular system, and abdomen were all found to be unremarkable. Regarding his extremities, Claimant's dorsalis pedis and posterior tibial pulses were palpable, without bruits or evidence of peripheral vascular insufficiency or chronic venous stasis, and with no clubbing, cyanosis or edema. The cervical spine examination triggered some complaints of stiffness and pain, with paravertebral tenderness, but no spasms with flexion to fifty degrees, extension to forty-five degrees, and rotation to seventy-five degrees bilaterally. Claimant's elbows and wrists exhibited normal range of motion with no pain or

tenderness, redness, warmth, or swelling. On range of motion of the shoulders, Claimant had some discomfort in the neck, back, and shoulder blade; however, range of motion was normal. (Tr. at 564). The examination of Claimant's hands showed no tenderness, redness, warmth, or swelling. Claimant could pick up coins with either hand and make a fist bilaterally. His grip strength was measured at 20, 22, 24 kg on the right and 18, 18, 20 kg on the left. Range of motion was normal and Claimant could write with the dominant hand without difficulty. Claimant's ankles and feet were also noted to be normal. Claimant's right knee revealed some palpable medial joint margin ridging with intermittent crepitus, and there was some pain and tenderness with normal range of motion. His left knee showed some mild intermittent patellofemoral crepitus, lesser ridging, and normal range of motion with no pain or tenderness. Neither knee was red, warm, or swollen. Dr. Beard found Claimant's dorsolumbar spine to have a normal curvature. Claimant had mild discomfort and stiffness with forward bending, some paravertebral tenderness, and some right-sided paravertebral tenderness rigidity, but no spasm. Flexion was to seventy-five degrees with an otherwise normal range of motion. Claimant could stand on one leg, alone, with no issue. Seated straight-leg raise was to ninety degrees without complaint and supine to seventy-five degrees with some back discomfort. Claimant's hips had normal range of motion with no pain or tenderness. Neurologically, there was some diminished sensation in the lateral right thigh without evidence of weakness. His strength measured 5/5 with no atrophy seen. Dr. Beard felt that Claimant gave good effort on manual muscle testing. His deep tendon reflexes were graded 2+ on biceps, triceps, patellae, and Achilles. He was able to heel-walk, toe-walk, tandem-walk, and squat.

Dr. Beard assessed Claimant with chronic cervical, thoracic, and lumbosacral strain; thoracolumbar spondylosis; hypotestosteronism; hypothyroidism; chronic arthralgias due to reported rheumatoid arthritis and osteoarthritis; and possible left meralgia paresthetica. (Tr. at 565). Dr. Beard summarized that Claimant had some mild motion abnormalities, some diminished sensation in the left thigh consistent with a lateral femoral cutaneous nerve distribution, but normal reflexes, negative straight-leg raising, and no obvious radiculopathy.  Claimant reported rheumatoid arthritis, but his symptoms were more consistent with osteoarthritis. Regarding Claimant's report of right ear damage and chronic imbalance with intermittent vertigo, Dr. Beard noted that his neurologic examination was unremarkable. Claimant had no nystagmus, and his extraocular movements and cranial nerves were intact. Claimant's reflexes were normal. Dr. Beard saw no significant imbalance during his assessment of Claimant. (Tr. at 565). Dr. Beard ordered an x-ray of Claimant's right knee, which was interpreted by Richard Laib, M.D. (Tr. at 566). Dr. Laib found no evidence of fracture, dislocation, soft tissue calcifications, or significant deformity. Minimal spurring was noted on the patella.

On January 18, 2012, Kara Gettman-Hughes, M.A., performed an Adult Mental Profile at the request of the SSA. (Tr. at 568-74). Ms. Gettman-Hughes's evaluation included a clinical interview, a mental status examination, a review of records, and the administration of the Wechsler Adult Intelligence Scale–Fourth Edition ("WAIS-IV") and the Wide Range Achievement Test-Fourth Revision ("WRAT-4"). Ms. Gettman-Hughes noted that Claimant traveled alone a distance of twenty-five miles to the appointment and presented with straight posture, although his gait appeared unsteady. (Tr. at 568). He presented a commercial driver's license as identification.

Claimant reported that he was applying for disability benefits due to back problems, bulging discs, degenerative disc disease, arthritis, fibromyalgia, numbness of the legs, low testosterone level, fatigue, vertigo, and a learning disability. (Tr. at 569). He cited functional limitations, chronic pain, emotional distress, and learning difficulties as the primary reasons he was unable to maintain full-time employment. Claimant reported he last worked in October, 2011 as a well tender; however, he was fired due to frequent medical appointments and because he was having problems driving due to vertigo. (Tr. at 569). He complained of being in constant pain, which resulted in feelings of frustration and depression. He also experienced sadness and a loss of interest in activities. Claimant described having sleep difficulties, stating that he felt guilty, worried excessively, and had trouble concentrating. Ms. Gettman-Hughes observed that Claimant was a very poor historian, verbose, and redundant with very slow processing speed.

Ms. Gettman-Hughes obtained Claimant's educational and vocational histories. (Tr. at 570). He stated that he had graduated from high school after being "in and out" of special education classes. Claimant also stated that he had been held back in the seventh grade. He did not know his GPA, but indicated that his athletic ability probably helped him move forward in school. Claimant identified his longest period of employment as nine years as a construction worker and rig operator. He had training with a jackhammer, dozer, and driving a truck. His most recent position was as a well tender. (*Id.*).

Ms. Gettman-Hughes administered the WAIS-IV and concluded that Claimant's general cognitive ability fell within the borderline range of intellectual functioning. (Tr. at 570). Claimant scored 87 in verbal comprehension, 81 in perceptual reasoning, 83

in working memory, and 76 in processing speed. His full scale IQ score was 78, which placed him within the seventh percentile of individuals in his age group. Ms. Gettman-Hughes deemed Claimant's IQ score to be valid, as he seemed to put forth good effort and did not appear frustrated when giving an incorrect answer. Scores for the WRAT-4 measured Claimant's reading level at the 4.3 grade level; his spelling at the 3.3 grade level; and his math computation skills at the 5.6 grade level. (Tr. at 572). His scores on the WRAT-4 were considered valid for the same reasons as the WAIS-IV scores.

Next, Ms. Gettman-Hughes recorded the results of Claimant's mental status examination. She described Claimant as cooperative with fair eye contact. His speech was responsive and coherent, although very verbose. Claimant was oriented in all spheres. His mood was notable for sadness with a restricted affect. (Tr. at 572). His thought processes showed preservative tendencies; however, there was no evidence of delusions, paranoia, obsessive thoughts, or compulsive behaviors. Claimant's judgment was mildly impaired based on responses to comprehensive questions, and his insight was poor based on his responses to questions of social awareness. Claimant showed no evidence of psychomotor agitation or retardation. His immediate memory was intact; his recent memory was mildly impaired, and his remote memory was fair. Ms. Gettman-Hughes found Claimant's concentration to be intact, but his persistence was moderately impaired based on his ability to remain focused on task. His pace was slow, as observed during the evaluation. Ms. Gettman-Hughes felt Claimant's social functioning during the evaluation was moderately impaired based on clinical observations such as eye contact, sense of humor, and mannerisms.

Ms. Gettman-Hughes diagnosed Claimant with pain disorder associated with both physiological factors and a general medical condition; major depressive disorder,

single episode moderate without psychotic features; generalized anxiety disorder; and borderline intellectual functioning. (Tr. at 573). Claimant reported he was capable of performing his activities of daily living, but his ability to help with household chores was limited. Claimant told her he could only stand for a maximum of fifteen to thirty minutes at a time. Claimant occasionally visited with friends and family, and he had a few close friends, but he rarely went out and no longer participated in his prior hobbies of hunting and fishing. Ms. Gettman-Hughes believed Claimant's prognosis to be poor; however, he was capable of managing funds should an award be made. (Tr. at 574).

On February 3, 2013, Subhash Gajendragadkar, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 577-84). He found Claimant to be limited to occasionally lifting twenty pounds, frequently lifting ten pounds, standing and/or walking approximately four hours in an eight-hour work day, and sitting about six hours in an eight-hour work day. He opined that Claimant would need to be able to alternate between sitting and standing every thirty minutes to relieve pain or discomfort. Claimant was unlimited in his ability to push or pull. (Tr. at 578). Claimant had postural limitations in that he could occasionally climb ramps and stairs, stoop, kneel, and crouch; however, he could never climb ladders, ropes or scaffolds, or crawl. (Tr. at 579). Claimant had no manipulative, visual, or communicative limitations. (Tr. at 580-81). As to environmental limitations, Claimant could tolerate unlimited exposure to extreme heat, wetness, humidity, and noise, but needed to avoid concentrated exposure to extreme cold and vibrations and even moderate exposure to hazards, such as machinery and heights. (Tr. at 581). Dr. Gajendragadkar found Claimant's symptoms and limitations mostly credible. (Tr. at 582). Nevertheless, Dr. Gajendragadkar disagreed with the medical source statement of Dr. Donald Moore

who restricted Claimant to a sedentary RFC with physical and environmental restrictions. Specifically, Dr. Gajendragadkar felt that the degree of limitation proposed by Dr. Moore was inconsistent with the medical findings in Claimant's treatment records and with the report of the consultative examination. (Tr. at 583).

On February 6, 2012, John Todd, Ph.D., completed a Psychiatric Review Technique. (Tr. at 585-98). Dr. Todd found evidence in the record that Claimant suffered from an organic mental disorder (borderline intellectual functioning), an affective disorder (major depressive disorder), an anxiety-related disorder (generalized anxiety disorder) and somatoform disorders (pain disorder associated with both psychological factors general medical conditions). (Tr. at 585-86, 588, 590-91). He did not believe that Claimant had any limitations in his activities of daily living, but had moderate difficulty maintaining social functioning, concentration, persistence, and pace. Claimant had no episodes of decompensation, nor was there evidence of the paragraph "C" criteria. (Tr. at 595-96). In his analysis, Dr. Todd opined that Claimant was mostly credible. He noted Claimant reported he attended special education classes; however, there were no significant school records available for review. Dr. Todd felt that Claimant had received a valid IQ score from Ms. Gettman-Hughes, but questioned whether he actually had moderate deficiencies in social functioning given that he attended church and had several close friends. Dr. Todd also felt that Claimant's persistence and pace were mostly affected by his pain, rather than by psychiatric symptoms, and without pain, his concentration and memory were probably within normal limits or only mildly deficient. He noted Claimant could perform his activities of daily living independently with difficulty related to his physical complaints. (Tr. at 597).

By report of same date, Dr. Todd completed a Mental Residual Functional Capacity Assessment. (Tr. at 599-602). He found that Claimant was not significantly limited in the ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance; be punctual within customary tolerances; sustain an ordinary routine; make simple work-related decisions; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions;  and travel in unfamiliar places or use public transportation. (Tr. at 599-600). However, Claimant was found moderately limited in his ability to understand, remember, and carry out detailed instructions; work in coordination with or proximity to others without being distracted by them; complete a normal workday and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general public; or get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (*Id.*). Dr. Todd opined that Claimant retained the mental capacity for two to three step work-like activities with low production demands and limited contact with others. (Tr. at 601).

On February 8, 2012, Dr. Gajendragadkar completed a Case Analysis regarding the Physical Residual Functional Capacity Assessment he completed on February 3, 2012. In the Case Analysis, he confirmed the effective date for his Physical Residual

Functional Capacity examination was the same as the alleged onset date of disability of October 12, 2011. (Tr. at 604).

On February 13, 2012, James Egnor, M.D., completed a Case Analysis. (Tr. at 606). Dr. Egnor noted Claimant complained of constant pain from the neck to the coccyx, back and leg pain, fatigue, dizziness, and vertigo, as well as some issues with self-care. Claimant was capable of preparing simple foods, mowing grass, driving, shopping, counting change and attending church three times a week; however, most of his activities were limited. With respect to Dr. Moore's medical source statement, Dr. Egnor opined that Dr. Moore's suggestion that Claimant was limited to sedentary work with other non-exertional limitations was not supported by the medical evidence of record. Although Claimant complained of chronic pain, there was no evidence of weakness or atrophy in the medical records. Claimant had a history of vertigo; yet, his gait was normal, and he functioned normally at the consultative examination. Claimant was able to drive and mow the lawn. Dr. Egnor believed it was reasonable to reduce Claimant to light work, noting that Claimant had degenerative changes to the spine, limited range of motion with forward flexion to seventy-five degrees, and a history of chronic pain. He felt that Claimant should never climb ladders, ropes, or scaffolds, but otherwise his postural functions were reduced to occasional. He had no manipulative limitations. Environmentally, Claimant should avoid concentrated exposure to cold and vibrations and should have only moderate exposure to hazards.

On July 24, 2012, Dr. Egnor completed a Physical Residual Functional Capacity Assessment. (Tr. at 607-25). Dr. Egnor found that Claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight hour workday; sit about six hours in an eight hour

workday; and had unlimited ability to push or pull. (Tr. at 608). As for postural limitations, Claimant could occasionally climb ramps and stairs, balance, stoop, kneel, crouch or crawl but could never climb ladders, ropes or scaffolds. (Tr. at 609). Claimant had no manipulative, visual, or communicative limitations. (Tr. at 610-11). In regard to environmental limitations, Claimant could have unlimited exposure to extreme heat, wetness, humidity, and noise, but need to avoid concentrated exposure to extreme cold and vibration, and even moderate exposure to hazards, such as machinery and heights. (Tr. at 611). Dr. Egnor reiterated his opinion that Dr. Moore's RFC assessment was not supported by the medical evidence and the proposed reduction to sedentary work was not appropriate. (Tr. at 613-14).

On July 13, 2012, Jeff Boggess, Ph.D., completed a Case Analysis noting that there were no new psychiatric allegations or medical records for reconsideration. (Tr. at 616). Accordingly, Dr. Boggess affirmed the February 6, 2012 assessments by Dr. Todd as written.

On July 24, 2012, A. Rafael Gomez, M.D., completed a Physical Residual Functional Capacity Assessment. (Tr. at 618-25). Dr. Gomez found Claimant could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and had unlimited ability to push and pull. (Tr. at 619). Claimant could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, balance, stoop, kneel, crouch, and crawl. (Tr. at 620). He had no manipulative, visual, or communicative limitations. (Tr. at 621-22). As for environmental limitations, Claimant could tolerate unlimited exposure to extreme cold, heat, wetness, humidity, noise, fumes, odors, dusts, gases or poor ventilation, but needed to avoid concentrated

30

exposure to vibration and hazards, such as machinery or heights. (Tr. at 622). Dr. Gomez observed that his assessment was similar to that of Dr. Egnor's completed on February 13, 2012. (Tr. at 623). Dr. Gomez further noted that, on January 5, 2012, Dr. Moore completed a Medical Source Statement of Ability to do Work-Related Activities, Physical, with a recommendation that Claimant be given a sedentary RFC with physical, manipulative and environmental restrictions. Dr. Gomez disagreed with that opinion, instead indicating that Claimant should be given a light Physical Residual Functional Capacity pursuant to Disability Determination Service Guidelines. (Tr. at 624).

## VI.   **Scope of Review**

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Blalock*, 483 F.2d at 776 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a de novo review of the evidence to ascertain whether the claimant is disabled. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 2001)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence

exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.   <u>Discussion</u>

Claimant first complains that the ALJ did not sufficiently reconcile conflicting medical source statements; thereby, preventing the Court from determining whether the RFC finding is supported by substantial evidence. In particular, Claimant points to opinions by his treating physician, Dr. Moore, and by an agency consultant, Dr. Gajendragadkar, concluding that Claimant needed a job that would allow him to alternate between sitting and standing periodically, or every thirty minutes. This sit/stand option was not included in two other medical source opinions and was not incorporated into Claimant's RFC finding. However, the ALJ never explicitly explained her reasons for rejecting the limitation. Claimant emphasizes that if the sit/stand option had been included in the RFC finding, then Claimant would have been limited to sedentary exertional work, and the Grids would have directed a finding of disability.

Social Security Ruling ("SSR") 96–8p provides guidance on how to properly determine a claimant's RFC, which is the claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." SSR 96–8p, 1996 WL 374184, at *1 (S.S.A. 1996). RFC is a measurement of the ***most*** that a claimant can do despite his or her limitations and is used at steps four and five of the sequential evaluation to determine whether a claimant can still do past relevant work and, if not, whether there is other work that the claimant is capable of performing. *Id.* According to the Ruling, the ALJ's RFC determination requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3. Only by examining specific

functional abilities can the ALJ determine (1) whether a claimant can perform past relevant work as it was actually, or is generally, performed; (2) what exertional level is appropriate for the claimant; and (3) whether the claimant "is capable of doing the full range of work contemplated by the exertional level." *Id.* Indeed, "[w]ithout a careful consideration of an individual's functional capacities to support an RFC assessment based on an exertional category, the adjudicator may either overlook limitations or restrictions that would narrow the ranges and types of work an individual may be able to do, or find that the individual has limitations or restrictions that he or she does not actually have." *Id.* at *4.

When determining a claimant's RFC, the ALJ will always consider the medical opinions in the case record in conjunction with the rest of the relevant evidence he receives. *See* 20 C.F.R. §§ 404.1513, 404.1527(b), 404.1545. Medical opinions are defined as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [his] symptoms, diagnosis and prognosis, what [he] can still do despite [his] impairment(s), and [his] physical or mental restrictions." *Id.* § 404.1527(a)(2). Title 20 C.F.R. § 404.1527(c) outlines how the opinions of accepted medical sources should be weighed in determining whether a claimant qualifies for disability benefits. In general, an ALJ should give more weight to the opinion of an examining medical source than to the opinion of a non-examining source. *Id.* § 404.1527(c)(1). Even greater weight should be allocated to the opinion of a treating physician, because that physician is usually most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. *Id.* § 404.1527(c)(2). Indeed, a treating physician's opinion should be given *controlling* weight when the opinion is

supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence. *Id.* If the ALJ determines that a treating physician's opinion is not entitled to controlling weight, the ALJ must then analyze and weigh all the medical opinions of record, taking into account certain factors[1] listed in 20 C.F.R. § 404.1527(c)(2)-(6), and must explain the reasons for the weight given to the opinions.[2] "Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected … In many cases, a treating source's opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight." Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *4. Nevertheless, a treating physician's opinion may be rejected in whole or in part when there is persuasive contrary evidence in the record. *Coffman v. Bowen,* 829 F.2d 514, 517 (4th Cir. 1987). Ultimately, it is the responsibility of the ALJ, not the court, to evaluate the case, make

---

[1] The factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) other factors bearing on the weight of the opinion.

[2] Although 20 C.F.R. § 404.1527(c) provides that in the absence of a controlling opinion by a treating physician, all of the medical opinions must be evaluated and weighed based upon various factors, the regulation does not explicitly require the ALJ to recount the details of that analysis in the written opinion. Instead, the regulation mandates only that the ALJ give "good reasons" in the decision for the weight ultimately allocated to medical source opinions. *Id.* § 404.1527(c)(2); *see also* SSR 96-2p, 1996 WL 374188, at *5 (stating that when a decision is not fully favorable, "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."). This Court has held that "while the ALJ also has a duty to 'consider' each of the … factors listed above, that does not mean that the ALJ has a duty to discuss them when giving 'good reasons.' Stated differently, the regulations require the ALJ to consider the … factors, but do not demand that the ALJ explicitly discuss each of the factors." *Hardy v. Colvin,* No. 2:13–cv–20749, 2014 WL 4929464, at *2 (S.D.W.Va. Sept. 30, 2014).

findings of fact, weigh opinions, and resolve conflicts of evidence. *Hays*, 907 F.2d at 1456.

In the written decision, the ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8p, 1996 WL 374184, at *7. The ALJ should "discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (e.g. 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the record." *Id.* Further, the ALJ should "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.*

In this case, the ALJ properly addressed the medical source opinions, beginning with the January 2012 RFC assessment prepared by Claimant's treating physician, Dr. David Moore. (Tr. at 19). The ALJ acknowledged that Dr. Moore found Claimant limited to lifting and carrying ten pounds, to standing and walking less than two hours in an eight-hour work day, to sitting for less than six hours in an eight-hour work day, and to periodically needing to alternate between sitting and standing to relieve pain. (Tr. at 19-20). The ALJ gave these opinions "little weight" despite Dr. Moore's longitudinal treatment relationship with Claimant. The ALJ explained that Dr. Moore's opinions were suspect, because he provided no objective basis for them; the opinions were contrary to his own treatment records; and Dr. Moore too easily accepted and relied upon, without question, Claimant's subjective reports of pain. (Tr. at 20). The ALJ had already discussed in the written decision the benign findings contained in Dr.

Moore's office records, the lack of treatment received by Claimant, and the discrepancies between Claimant's complaints and the remaining evidence. Having previously concluded that Claimant's statements were not entirely credible, the ALJ viewed Dr. Moore's opinions as lacking a solid foundation and as being contrary to other persuasive evidence. Moreover, the ALJ highlighted physical findings made by an examining consultant, Dr. Kip Beard, just days after Dr. Moore's RFC assessment that significantly undermined the reliability of Dr. Moore's opinions.

Clearly, the ALJ was entitled to reject Dr. Moore's opinions on the stated grounds, and she provided a reasonable written narrative explaining her reasons for the minimal weight she gave to the opinions. Given that Dr. Moore's opinions were not entitled to controlling weight, the ALJ correctly proceeded to examine the remaining medical source statements.

Three other physical RFC assessments were in the record, all of which were provided by non-examining agency consultants. As far as exertional limitations, all three consultants (Dr. Gajendragadkar, Dr. Egnor, Dr. Gomez) opined that Claimant could lift and carry twenty pounds occasionally and ten pounds frequently. (Tr. at 578, 608, 619). All three felt that Claimant could sit about six hours in an eight-hour work day and had an unlimited ability to push and pull. (*Id.*). However, while Dr. Egnor and Dr. Gomez opined that Claimant could stand and walk up to six hours in an eight-hour work day, with no requirement to alternate between positions, Dr. Gajendragadkar stated that Claimant could stand and walk about four hours in an eight-hour work day and would need to alternate between standing and sitting every thirty minutes. (*Id.*). The ALJ specifically discussed the three opinions, but never made any effort to reconcile the key difference between them. Instead, she simply proceeded to give all

36

three opinions "significant weight," concluding that they were consistent with the medical records and were supported by the evidence.

The ALJ's failure to explicitly address the sit/stand option recommended by Dr. Gajendragadkar and provide a rationale for not including such an option in the RFC finding is troubling. Without an explanation, it is impossible for the Court to know if the ALJ actually assessed the recommendation and rejected it, or merely overlooked it when she framed Claimant's RFC finding. The Commissioner argues that the ALJ rejected a similar sit/stand option when suggested by Dr. Moore, because it was not supported by the evidence; accordingly, the Court can assume that the same reason applies to the rejection of Dr. Gajendragadkar's sit/stand opinion. The Commissioner's position is unpersuasive. For one thing, the ALJ did not expressly reject any aspect of Dr. Gajendragadkar's opinions. To the contrary, she gave his opinions significant weight. Furthermore, the ALJ found Dr. Moore's opinions unsupportable because he relied too heavily on Claimant's subjective statements and the opinions conflicted with Dr. Moore's own treatment records. In contrast, Dr. Gajendragadkar never spoke with Claimant and expressly indicated in his RFC assessment that his sit/stand option was based upon Dr. Beard's findings made during the consultative examination. (Tr. at 578). The ALJ gave great weight to Dr. Beard's findings. (Tr. at 21). Consequently, the ALJ's reasons for rejecting Dr. Gajendragadkar's sit/stand option, assuming reasons can be implied, simply could not be the same as those given for refusing the similar limitation suggested by Dr. Moore.

Unfortunately, as Claimant points out, the ALJ's failure to address Dr. Gajendragadkar's sit/stand recommendation is problematic in view of the vocational expert's testimony. At the administrative hearing, the vocational expert testified that

37

Claimant's prior work as a well tender was classified under the Dictionary of Occupational Titles ("DOT") as semi-skilled, heavy exertional work, and his rig operator position was classified as skilled, medium exertional work. (Tr. at 63). Claimant was unable to perform his prior work given his exertional restriction to light level positions. Moreover, while Claimant had some skills that were transferrable to light level work, the vocational expert testified that Claimant had no skills that would transfer to sedentary work. (Tr. at 64).

The ALJ questioned the vocational expert regarding available jobs for a hypothetical individual with Claimant's education, work history, age, and RFC, and the vocational expert was able to provide jobs at both the light and sedentary levels that Claimant could perform. (Tr. at 64-67). The vocational expert confirmed that his testimony was consistent with the DOT. However, when Claimant's attorney asked the vocational expert a hypothetical question based upon Dr. Moore's RFC assessment, which included the sit/stand option, the vocational expert indicated that such an individual would be limited to sedentary positions for all practical purposes. (Tr. at 67-68). According to the vocational expert, this was particularly true "when you add in the sit stand option." (Tr. at 68).

Therefore, if Claimant's RFC finding had included a sit/stand option, which restricted Claimant to sedentary work,[3] this restriction unquestionably would have changed the step five analysis and the outcome of the disability decision. At step five of the process, "RFC must be expressed in terms of, or related to, the exertional categories

---

[3] It is not entirely clear from the transcript if Claimant would be reduced to sedentary exertional work on the basis of the sit/stand option alone. A portion of the vocational expert's testimony was inaudible and, thus, was not transcribed. Nevertheless, remand is required to insure that Claimant's RFC finding accurately represents his ability to do work-related activities so that a proper determination can be made at step five of the disability process.

when the adjudicator determines whether there is other work the individual can do." SSR 96-8p, 1996 WL 374184, at *3 (S.S.A. 1996). Once the ALJ has determined a claimant's RFC, age, education, and work experience, the ALJ must consult the Medical-Vocational Guidelines (the "Grids") to ascertain whether a medical-vocational rule makes the disability determination. 20 C.F.R. Pt. 404, Subpart P, Appendix 2. The Grids "take administrative notice of the availability of job types in the national economy for persons having certain characteristics, namely age, education, previous work experience, and residual functional capacity." *Grant v. Schweiker*, 699 F.2d 189, 191-92 (4th Cir. 1983); s*ee also* 20 C.F.R. §§ 404.1569. The Grids "contain numbered table rules which direct conclusions of 'disabled' or 'not disabled' where all of the individual findings coincide with those of a numbered rule." SSR 83-12, 1983 WL 31253, at *1 (S.S.A. 1983). Because the Grids "reflect the major functional and vocational patterns which are encountered in cases which cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental impairment(s) is not engaging in substantial gainful activity and the individual's impairment(s) prevents the performance of his or her vocationally relevant past work," an ALJ may rely on the Grids when determining whether there are jobs that exist in significant numbers in the national economy that a particular claimant can perform. 20 C.F.R. Pt. 404, Subpt. P, App'x 2 § 200.00.

Nonetheless, the Grids are of limited usefulness in that they presume that a claimant can do the full range of work at the exertional level that corresponds with each numbered rule; in other words, that the claimant is able to perform substantially all of the functions required of work at the rule's strength level. *Aistrop v. Barnhart*, 36 F.App'x 145, 146 (4th Cir. 2002) ("If the claimant has no nonexertional impairments

39

that prevent her from performing the full range of work at a given exertional level, the Commissioner may rely solely on the Grids to satisfy his burden of proof.") (citing *Coffman v. Bowen,* 829 F.2d 514, 518 (4th Cir.1987)). When a claimant has significant nonexertional impairments or performs at a level that falls between two exertional levels, the Grids often do not provide adequate information for the ALJ to complete the disability analysis. 20 C.F.R. §§ 404.1569. Consequently, when a claimant has significant nonexertional impairments, or has a combination of exertional and nonexertional impairments, the Grids provide a framework for the ALJ. *Id.* In these cases, the ALJ begins the step five process by consulting the Grids to determine whether a rule directs a finding of disability based on the strength requirement alone. If a rule so directs, then there is no need to assess the effects of the nonexertional limitations. On the other hand, if the rule directs a finding of nondisability, the ALJ typically consults with a vocational expert to determine if jobs exist in sufficient numbers, which the claimant is capable of performing.

In the instant action, Claimant's age category changed from younger individual to individual closely approaching advanced age on his fiftieth birthday in April 2012. (Tr. at 23). Therefore, the ALJ had to examine the Grids in both age categories. *See Tanner v. Colvin*, No. 4:15-CV-27-FL, 2016 WL 626493, at *5 (E.D.N.C. Jan. 26, 2016) (citing *Mitchell v. Astrue,* No. 3:10–CV–544–RJC–DSC, 2011 WL 5037134, at *2 (W.D.N.C. Oct. 24, 2011) ("The ALJ must look to the Claimant's age from the time she alleges she was disabled until the date the ALJ announces his decision."). According to the Grids, "individuals approaching advanced age (age 50-54) may be significantly limited in vocational adaptability if they are restricted to sedentary work"; particularly, when they "can no longer perform vocationally relevant past work and have no

transferable skills." 20 C.F.R. Pt. 404, Subpt. P, App'x 2 § 201.00(g). Indeed, under Rule 201.14, an individual closely approaching advanced age is disabled when he (1) is limited to sedentary work; (2) has a high school education; and (3) has prior work experience that is skilled or semi-skilled, but has no transferrable skills. *Id.* at Rule 201.14. Accordingly, if Claimant's RFC were restricted to sedentary work, then upon his fiftieth birthday, his findings under the Grids would have coincided with those of Rule 201.14, directing a determination of disability.

Given this result under the Grids, the undersigned **FINDS** that the ALJ's perplexing treatment of Dr. Gajendragadkar's opinions, her failure to address his recommendation of a sit/stand option, and her failure to reconcile that opinion with the RFC finding, which contained no sit/stand option, were all procedural errors that require remand of this matter. In general, remand of a procedurally deficient decision is not necessary "absent a showing that the [complainant] has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses." *Connor v. United States Civil Service Commission,* 721 F.2d 1054, 1056 (6th Cir.1983); *Burch v. Astrue,* 2011 WL 4025450, at *6 (W.D.N.C July 5, 2011) (*citing Camp v. Massanari,* 22 F.App'x 311 (4th Cir. 2001)) (Claimant must show that absent error, the decision might have been different). While an ALJ is not required to comment on every piece of evidence in the record, he is obligated to discuss the evidence supporting his decision *as well as* "the uncontroverted evidence he chooses not to rely upon," and "significantly probative evidence he rejects." *Clifton v. Chater,* 79 F.3d 1007, 1010 (10th Cir. 1996) (citing *Vincent ex rel. Vincent v. Heckler,* 739 F.2d. 1393 (9th Cir. 1984)). The ALJ must "explain on the record the reasons for his findings, including the reason for rejecting relevant evidence in support of the claim. Even if legitimate reasons exist

for rejecting or discounting certain evidence, the [ALJ] cannot do so for no reason or for the wrong reason." *King v. Califano,* 615 F.2d 1018, 1020 (4th Cir.1980) (citation omitted). Considering the potential importance of the sit/stand option in this case, the Court should be able to determine from the written decision if the ALJ fully considered that option, and if so, why the option was rejected. The Court cannot. Thus, the Court simply "cannot tell whether [the ALJ's] decision is based on substantial evidence." *Cook v. Heckler,* 783 F.2d 1168, 1172 (4th Cir. 1986). Consequently, the errors in this case are not harmless, and the matter should be remanded so that proper attention can be given to the sit/stand option.

Claimant next complains that the ALJ failed to adequately describe Claimant's educational and persistence/pace limitations to the vocational expert. Claimant argues that the ALJ should have insured that the vocational expert knew that Claimant had limited reading and spelling skills and deficits in his ability to stay on task. (ECF No. 7 at 17-18). The undersigned **FINDS** this challenge to be without merit. With respect to Claimant's ability to read and spell, the vocational expert was present at the administrative hearing and heard testimony from Claimant regarding his education. Claimant testified that he was placed in special education classes beginning in junior high school, and that he took special education welding. (Tr. at 36-37). In addition, the vocational expert had access to Claimant's vocational records; accordingly, he was well aware of the skilled and semi-skilled work-related tasks that Claimant had mastered in the past. Therefore, the vocational expert was suitably knowledgeable of Claimant's educational background and prior comprehension skills. Nothing in the record suggests that Claimant is illiterate or suffers from cognitive deterioration, nor has Claimant provided any evidence to demonstrate that the ALJ's RFC restriction to

simple tasks did not adequately account for Claimant's limitations in reading and spelling.

As far as Claimant's moderately limited persistence and pace, the ALJ discussed the findings of Ms. Gettman-Hughes on consultative examination, as well as the psychological RFC assessments by agency consultants, Drs. Todd and Boggess. (Tr. at 23). The ALJ agreed with their opinions that Claimant had moderate limitations in persistence and pace and with their recommendations that Claimant be restricted to simple tasks with no production demands and limited contact with others. As a result, in the RFC finding, the ALJ limited Claimant to simple tasks with only occasional interaction with co-workers and supervisors, no interaction with the public, only simple work-related decisions, only simple changes in work routine, and no fast-paced production requirements. (Tr. at 16). These RFC restrictions were clearly intended to account for any functional limitations associated with Claimant's reduced persistence and pace.

Claimant relies on the Fourth Circuit's opinion in *Mascio v. Colvin* for the proposition that the aforestated restrictions in the RFC finding were inadequate to address Claimant's deficits in persistence and pace. *Mascio,* 780 F.3d 632 (4th Cir. 2015). However, the *Mascio* decision is inapposite. In *Mascio*, the ALJ failed to include any limitations in a hypothetical question to a vocational expert designed to address the claimant's uncontroverted mental impairments, which caused moderate limitations in concentration, persistence, or pace. In response to the hypothetical question, the vocational expert supplied potential jobs that the claimant could perform, which were "unskilled." On appeal, the Fourth Circuit found that the ALJ should have expressly addressed the claimant's mental impairments in some way, and the

43

vocational expert's limitation of the claimant to unskilled jobs did not rectify the ALJ's error. The Fourth Circuit explained that "the ability to perform simple tasks differs from the ability to stay on task" and "[o]nly the latter limitation would account for a claimant's limitation in concentration, persistence, or pace." *Id.* at 638. The Fourth Circuit added that restricting a claimant to simple, routine, or unskilled tasks did not necessarily account for moderate deficits in concentration, persistence, or pace; therefore, the ALJ must either include limitations in the RFC finding specifically designed to address the functional consequences of these deficits, or explain why the deficits do not translate into functional limitations. *Id.*

Here, the ALJ clearly considered Claimant's reduced ability to maintain persistence and pace, identified functional limitations associated with those impairments, and incorporated restrictions in the RFC finding designed to accommodate Claimant's deficiencies. The ALJ did not simply limit Claimant to routine, unskilled tasks. She also reduced Claimant's contact with other individuals who might distract Claimant; she kept Claimant from having to make difficult decisions or complicated changes at work; and she restricted Claimant from any jobs that required him to perform at a fast production rate. These limitations sufficiently addressed Claimant's moderate impairments in persistence and pace. *See, e.g., Fisher v. Colvin,* Civil No. TMD 14–1011, 2015 WL 5287120, at *9 (D. Md. Sept. 9, 2015); *Gilbert v. Colvin,* Civil Action No. 2:14–981–MGL–MGB, 2015 WL 5009225, at *13 (D.S.C. Aug. 19, 2015); *and Massey v. Colvin*, No. 1:13CV965, 2015 WL 3827574, at *7 (M.D.N.C. Jun. 19, 2015). The hypothetical questions to the vocational expert included the limitations contained in the RFC finding. (Tr. at 65-66). Accordingly, the ALJ did not err in communicating the functional deficits associated with Claimant's mental

impairments, and Claimant's second challenge does not provide a ground for remand.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the United States District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **GRANT** Plaintiff's Brief in Support of Complaint to the extent that it seeks reversal and remand of the Commissioner's decision, (ECF No. 7); **DENY** Defendant's Brief in Support of the Defendant's Decision, (ECF No. 8); **REVERSE** the final decision of the Commissioner; **REMAND** this matter pursuant to sentence four of 42 U.S.C. § 405(g) for further administrative proceedings consistent with this PF&R; and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*,

474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED**:  April 21, 2016

Cheryl A. Eifert
United States Magistrate Judge

46